# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| ZUKU YALLEY, | Civil No. 11-1961 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| OZARK AUTOMOTIVE DISTRIBUTORS, INC., | |
| Defendant. | |

Daniel Gray Leland, **BAILLON THOME JOZWIAK & WANTA LLP**, 222 South Ninth Street, Suite 2955, Minneapolis, MN 55402, for plaintiff.

Thomas A. Gilligan, Jr., **MURNANE BRANDT, PA**, 30 East Seventh Street, Suite 3200, St. Paul, MN 55101, for defendant.

Plaintiff Zuku Yalley ("Yalley") brings this action against his former employer, Ozark Automotive Distributors, Inc. ("O'Reilly"), alleging reprisal in violation of the Minnesota Human Rights Act ("MHRA"), retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and retaliation in violation of the Minnesota Workers' Compensation Act ("WCA"), Minn. Stat. § 176.82, subd. 1, in connection with the termination of his employment at O'Reilly.[1]  O'Reilly brings a motion for summary judgment on each of these claims.  Because there remain genuine issues of material fact, the Court will deny O'Reilly's motion for summary judgment.

---

[1] Yalley voluntarily dismissed other counts in the complaint. (*See* Docket Nos. 22, 23.)

# BACKGROUND[2]

## I.   YALLEY'S EMPLOYMENT

Yalley was born in Liberia and moved to the United States on January 25, 2000. (Aff. of Nicholas O'Connell, Ex. A (Dep. of Zuku Yalley ("Yalley Dep.") 9-10), Aug. 1, 2012, Docket No. 26.)  Yalley is black.

O'Reilly is a retail distributor of automotive parts for O'Reilly Auto Parts stores and independent jobbers.  (*See* Rule 7.1 Disclosure Statement, Aug. 24, 2011, Docket No. 12.)  It is headquartered in Springfield, Missouri, and operates "Distribution Center 16" ("DC16") in Brooklyn Park, Minnesota, which distributes parts to stores located in Minnesota, North Dakota, South Dakota, and Wisconsin.

Yalley began working for O'Reilly on June 16, 2007, at DC16.  (Yalley Dep. 28-29; *see also* O'Connell Aff., Ex. D (Dep. of Ken Sperle 15).)  O'Reilly employed Yalley as an "order picker," filling orders intended for shipment to various stores.  (Yalley Dep. 22-23; O'Connell Aff., Ex. C (Dep. of Brian Roesler 16).)

## II.   FIRST COMPLAINTS OF DISCRIMINATION

Yalley claims that in 2007, less than six months after he began his employment with O'Reilly, he spoke with an order processing supervisor about potential discrimination in the workplace.  (Yalley Dep. 39-44.)  Yalley claims that, after this date, there was a "mood change" in the company and that employees who used to treat him in a friendly manner no longer spoke to him.  (*Id.* 39-44.)

---

[2] This section outlines the facts in the light most favorable to Yalley, pursuant to the summary judgment standard.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In March 2008, Yalley reported that he experienced discrimination from a white employee at work. (*Id.* 80; Leland Decl., Ex. 7 at 12.) Yalley complained to various supervisors, including Eric Ruud, the human resources supervisor at DC16, because he believed that the employee had not been appropriately disciplined for the discrimination or disciplined in a similar manner to black employees. (Yalley Dep. 84-87, 91-95, 104-105.)

### III.   YALLEY'S INJURY

On May 16, 2008, Yalley climbed onto a stepstool and was pulling a sledgehammer from a shelf. (*Id.* 60-61; Decl. of Daniel Gray Leland, Ex. 22, Aug. 22, 2012, Docket No. 29.) A hammerhead hit Yalley in the face, and he fell backward, landing on his right hip and buttocks. (Yalley Dep. 60-61; Decl. of Daniel Gray Leland, Exs. 11 ¶ 9, 22 ¶ 9, Aug. 22, 2012, Docket No. 29.) Yalley was diagnosed with a "right orbital blowout fracture," a contusion of the right hip, and gluteal muscular contusions. (Leland Decl., Ex. 11 ¶¶ 10-11, 18.) Yalley reported the hip and gluteal contusions as part of a later workers' compensation claim and sought treatment for these conditions. (*Id.*, Ex. 11 ¶¶ 16-18.)

### IV.   FURTHER MISTREATMENT AND REPORTS OF DISCRIMINATION

In or around June 2008, Yalley began reporting to Charles Wood, an order processing supervisor. (*See* Yalley Dep. 80, 110-11; Leland Decl., Ex. 17.) Yalley claims that Wood made racist comments toward him and accused him of faking his workplace injuries. (Yalley Dep. 230-31.) For example, Wood would mock Yalley's

accent and national origin, saying things such as, "I don't understand what you are saying, speak English.  Are you saying goo-goo ga-ga?  You don't know this is America?  We speak English here.  This is not Africa." (*Id.* 81.)  When Yalley reported some of Wood's treatment to an operations manager, the manager allegedly responded that Wood was "joking," a response Yalley deemed inadequate.  (*Id.* 178-79.)

Yalley also alleges that he received other poor treatment from O'Reilly employees and supervisors due to his workplace injuries.[3]  For example, when Yalley accidentally missed a doctor's appointment for his injury, he claims that Ruud yelled at him, "Every time you miss an appointment, the company [has] to pay that money[,]" that he was "sick of all [Yalley's] excuse[s]" and "one day this will be over, I just can't wait, you know, I just can't wait." (*Id.* 198-99, 289.)

In July 2008, Yalley claims that he met with several members of O'Reilly's "management team," including Ruud.  (*Id.* 181; Leland Decl., Ex. 7 at 12.)  At this meeting, Yalley states that he reported various examples of discrimination.  (Yalley Dep. 181, 236-37; Leland Decl., Ex. 7.)  According to Yalley, the management team refused to investigate or credit his complaints.  For example, Ruud allegedly told Yalley that they would hire who they wanted and would run O'Reilly the way they wanted. (Yalley Dep. 182; Leland Decl., Ex. 7 at 12.)  Yalley claims that he was then instructed by two supervisors that he was not allowed to speak to any of his co-workers, was to just do his

---

[3] Yalley states, for example, that supervisors and managers kept documentation of his injuries to try to prove that he was faking his symptoms, that he was laughed at for being in pain, and that he was given tasks upon his return to work that aggravated his injury.  (*See* O'Connell Aff., Ex. B (Dep. of Eric Ruud 88-91); Yalley Dep. 64, 66-67, 71-76, 198-99, 276, 280-81, 289.)  Ruud admits that he "questioned" whether Yalley had lower back and right hip pain.  (Ruud Dep. 77-78, 82.)

job, and that they were giving him a "final warning." (Yalley Dep. 234-35; Leland Decl., Ex. 7.) Then, in November 2008, Yalley claims that he had another meeting to report discrimination, specifically the failure to hire minority women, with Ruud and Brian Roesler, the distribution center manager. Yalley claims that Ruud and Roesler told Yalley that they would run DC16 the way they wanted, and that Yalley should not raise these concerns or make these reports again. (Leland Decl., Ex. 7.)

On or around January 20, 2009, Yalley gave Ruud a letter he wrote entitled, "The Letter of Change!!" (Yalley Dep. 204-07; Ex. 9.) This is the first complaint that O'Reilly admits that Yalley made to O'Reilly employees about discrimination. Yalley stated in the letter that O'Reilly had not taken action in response to his previous complaints, and he outlined various examples of discrimination at O'Reilly that he felt the company must address. (Leland Decl., Ex. 9; Yalley Dep. 205-06.)

After receiving the letter, Ruud brought it to Roesler and sent it to Mindy Morgan at the corporate office. (Ruud Dep. 101.) Ruud thought the letter "was in essence an attack on me and the way I do my job" and testified that he thought the letter was "a bunch of baloney." (*Id.* 101.)

V.   **ANOTHER INJURY AND LEAVE**

On May 28, 2009, Yalley again alleged that he injured his back at work and sought treatment for his injury. (Leland Decl., Ex. 11 ¶¶ 26-28.) O'Reilly's claims administrator denied the claim and deemed it a non-work-related injury. (Ruud Dep. 139.) As a result of this injury, Yalley was on leave from O'Reilly until February 2010,

after which he was released to return to work without restrictions.  (*See* Leland Decl., Exs. 27, 28, 33; Ruud Dep. 138.)

## VI.  FILING OF DISCRIMINATION CHARGES

On October 5, 2009, while on administrative leave, Yalley filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (*See* Leland Decl., Ex. 8.)[4]  Yalley's charge alleged discrimination based on his race (black), national origin (Liberian), and disability, and it also alleged retaliation.  (*Id.*, Ex. 8.)  Yalley's charge further alleged that O'Reilly refused to accommodate him in retaliation for his complaints.  (*Id.*, Ex. 8.)[5]

## VII.  YALLEY'S ALLEGED PERFORMANCE DEFICIENCIES

### A.  Performance Expectations and Evaluations

Order pickers for O'Reilly are evaluated, in part, based upon the employee's accuracy in picking the correct parts and the employee's speed or "productivity." (Leland Decl., Ex. 12 (Dep. of Theresa Siverhus at 15).)  Ordinarily, if an order picker is "struggling to be successful in a particular area, [O'Reilly] coach[es] and counsel[s] that individual to try and help them become successful in that area.  And at some point in time, if the individual continues to fail to be successful, [O'Reilly] need[s] to move into

---

[4] Yalley points out that he is not the only employee to complain about discrimination at O'Reilly.  (*See* Leland Decl., Exs. 13, 34, 35.)

[5] On December 20, 2010, Yalley filed an amended charge of discrimination.  (O'Connell Aff., Ex. I.)  Then on May 25, 2011, per Yalley's request, the EEOC issued a notice of right to sue and indicated it was terminating its processing of Yalley's charges of discrimination.  (*Id.*, Ex. J.)

. . . the corrective action phase." (Sperle Dep. 21-22.)  O'Reilly claims that Yalley had a long history of deficiencies in attendance, behavior, productivity, and accuracy, leading to the issuance of disciplinary notices.  (Yalley Dep., Exs. 1-29.)[6]

### B.    Authority to Make Termination and Disciplinary Decisions

O'Reilly alleges that termination and disciplinary decisions did not occur at DC16 without the consent of Roesler and approval from O'Reilly's corporate office in Springfield, Missouri.  The parties dispute whether Eric Ruud, the human resources supervisor at DC16, was also a decision-maker in terminations.

Roesler testified that, when he approved a corrective action, he would consult with Ruud.  He also testified that any time DC16 would administer a decision-making leave, a first and final warning, or a termination, he, Ruud, or both he and Ruud would first have a conversation with someone in O'Reilly's corporate office.  In these conversations with the corporate office, Roesler or Ruud would propose a course of action and the corporate office would ratify the decision or refuse to approve the decision.  (Roesler Dep. 41-43.) Ruud testified that he is required to consult with the corporate offices "before I [Ruud] can terminate anyone" because "we" (presumably DC16) "do not have the authority to terminate." (Ruud Dep. 58-59.)

---

[6] When Yalley returned to work on or around February 15, 2010, after his second injury, his progression in O'Reilly's progressive disciplinary process was reset.  (*See* Roesler Dep. 180; Yalley Dep., Exs. 20-29.)  He was then given a variety of notices and warnings that he was not meeting O'Reilly's standards for accuracy and productivity.  (*See, e.g.*, Leland Decl., Ex. 39.) He was also given warnings for other reasons, such as not wearing the appropriate uniform to work.  (Yalley Dep., Ex. 25; Leland Decl., Ex. 47.)  Yalley claims that his productivity and accuracy numbers are incorrect, that unfair and false accusations were made against him, and that he inappropriately received warnings and disciplinary action.

## VIII. WORKER'S COMPENSATION HEARING

On April 30, 2010, Yalley's claim for workers' compensation benefits was heard before a workers' compensation judge. (Leland Decl., Ex. 48.) Ruud and Roesler attended the hearing, and Ruud provided testimony. (Ruud Dep. 83.)

The workers' compensation judge was asked to determine the nature of Yalley's injuries on May 16, 2008, and May 28, 2009, and if Yalley was entitled to claimed wage loss benefits due to those injuries. (Leland Decl., Ex. 11.) The judge decided that Yalley's injuries were work-related and that Yalley was owed wage loss benefits for the periods from (1) May 16, 2008, through August 4, 2008, and (2) May 28, 2009, through July 15, 2009. (*Id.*, Ex. 11.) Yalley was also awarded payment for his medical treatment during those periods. (*Id.*, Ex. 11.)

Ruud received the order of the workers' compensation judge shortly after July 19, 2010. (Ruud Dep. 202.) He read the order and shared it with Roesler. (*Id.* 202.)

## IX. YALLEY'S TERMINATION

### A. Termination Meeting

On July 23, 2010, Yalley met with Ruud and Roesler. (Yalley Dep. 263; Leland Decl., Ex. 49). According to Yalley, Ruud stated at the meeting that Yalley no longer worked for O'Reilly. (Yalley Dep. 263.) Yalley asked why, and Rudd handed him his termination notice and told him that the reason for his termination was described on the notice. (*Id.* 264.) The notice stated that O'Reilly was terminating Yalley for performance deficiencies. (Leland Decl., Ex. 49.) Ruud further told Yalley, "[I]t's not only based on this document, but we have a lot of stuff." (Yalley Dep. 264.) He said that

- 8 -

Yalley had cost the company too much money and time and was not a productive employee. (*Id.* 264.) Ruud also said something like, "Not only that, but you've been spreading rumors, Zee, [that] the company don't like minorit[ies] or they're discriminatory to you and to your disability and they don't hire the right amount, whatever you feel. And we['re] just sick of it. And I couldn't wait for the day. It's finally over." (*Id.* 268-69.) Yalley claims that Ruud did most of the talking during the meeting. Ruud and Roesler then walked Yalley out of the building. (*Id.* 265-66.)

### B. Decision to Terminate

Ruud testified that he and Roesler proposed that Yalley be terminated, a recommendation which the corporate office then approved. (Ruud Dep. 63.) At his deposition, Roesler stated that he took the ultimate authority for the decision to terminate Yalley and that he consulted with Ruud, Ken Sperle (the Outbound Operations Manager at DC16), and members of the human resources department. (Roesler Dep. 119.) Roesler claimed that Ruud attended Yalley's termination meeting as a witness. (Roesler Dep. 202-03.) Ruud likewise claimed that during the termination meeting, he was there mostly as a witness and Roesler did most of the talking. (Ruud Dep. 198-99.)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## II.   TITLE VII AND THE MHRA

The Court must first analyze Yalley's claims for retaliation under Title VII and reprisal under the MHRA. Title VII prohibits an employer from retaliating against an employee for "oppos[ing] any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Under the MHRA, it is an "unfair discriminatory practice" for an employer to "intentionally engage in any reprisal" against a person because that person opposed the employer's alleged discriminatory practices. Minn. Stat. § 363A.15(1). "Reprisal" includes "any form of intimidation, retaliation, or harassment." *Id.*

"To defeat summary judgment on a retaliation claim, a plaintiff must produce either direct evidence of retaliation, or create an inference of retaliation under the McDonnell Douglas burden-shifting framework." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011). Yalley claims that he can establish direct evidence of retaliation through Ruud's statements at the termination meeting, making the McDonnell Douglas

framework unnecessary. The Court will thus consider whether Yalley has presented direct evidence to support his Title VII and MHRA claims.[7]

### A.   Content of Statements

The Court must first determine if the content of Ruud's statements at the termination meeting could be considered direct evidence of retaliation. Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *See, e.g.*, *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006). "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "The term 'direct evidence,' as used, is simply evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 n.3 (8th Cir. 2007).

O'Reilly claims that Ruud's alleged statements at the time of Yalley's termination cannot be considered direct evidence because they are too vague and require inferences and presumptions in order to prove retaliation. As noted above, Ruud stated that Yalley was being terminated because he had been costing the company too much money and

---

[7] There is no dispute that Yalley engaged in protected conduct, through his EEOC complaint, and that he suffered an adverse employment action, through his termination. Yalley has also raised questions of fact regarding whether he engaged in other protected conduct, through his earlier complaints about discrimination to supervisors, and whether he received retaliatory treatment as a result. *See, e.g.*, *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1078 (8th Cir. 2010) (holding that employee engaged in protected conduct by reporting discrimination complaint to her supervisor).

time and had been "spreading rumors" that the company didn't "like minorit[ies] or they're discriminatory to you and to your disability and they don't hire the right amount, whatever you feel." O'Reilly argues that these statements are not direct evidence and could instead be legitimate, nondiscriminatory reasons for termination.

The Court finds that O'Reilly's alleged statements demonstrate a specific link between a materially adverse action and the protected conduct and therefore constitute direct evidence. Complaints about what an employee reasonably believes is discrimination are protected conduct, whether the complaints are considered by an employer to be false "rumors" or legitimate complaints. *See Pye*, 641 F.3d at 1020; *Benson v. Little Rock Hilton Inn*, 742 F.2d 414, 417 (8th Cir. 1984). Here, the only evidence of discrimination complaints made by Yalley is complaints to his supervisors at O'Reilly and to the EEOC. Indeed, Ruud specifically referenced Yalley's complaints – made to his supervisors and in his EEOC charge – that O'Reilly did not hire the right amount of minorities. Thus, there is no "inference" needed to determine that Ruud's statement about Yalley being terminated for spreading rumors about discrimination can be considered direct evidence of retaliation. *See Bakhtiari*, 507 F.3d at 1137 n.3.

### B.   Role in Termination Decisions

To determine if Yalley has established direct evidence of retaliation, the Court must next determine if statements from Ruud can constitute direct evidence, given Ruud's level of involvement in employee termination decisions. Direct evidence does not include "'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" *Browning v.*

*President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)); *see also Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). However, "the direct evidence inquiry is not limited to those formally entrusted with decisionmaking duties." *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 641 (8th Cir. 2002) (holding that comments by supervisor not "officially responsible" for hiring could constitute direct evidence where supervisor played a "pivotal role" in hiring and officials deferred to his hiring decision).[8] Statements from those "closely involved" in hiring or termination decisions may be direct evidence of discrimination. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir. 2011) (citing cases).

The Court finds that there is enough evidence that Ruud was "closely involved" in termination decisions, and Yalley's termination in particular, that his statements could constitute direct evidence of retaliation. *See Schierhoff*, 444 F.3d at 966 (considering whether the employee was involved in the process of deciding whether to terminate employees and had a substantive role in the decisionmaking process). Ruud was present at the meeting where Yalley was terminated, he discussed terminating employees in the first person ("before I [Ruud] can terminate anyone. . ."), he stated that he and Roesler recommended Yalley's termination to the corporate office, and, according to Yalley, he explained the reasons for Yalley's termination at the termination meeting. *See EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 924 (8th Cir. 2002) (finding that statements from "a

---

[8] *Mohr* was abrogated on other grounds by *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003).

nondecisionmaker who was closely involved in the decisionmaking process and who was directed to express the decision of the decisionmakers to the employee" could constitute direct evidence of discrimination).[9]  Likewise, Roesler confirmed that he consulted with Ruud prior to taking corrective actions against employees and that sometimes Ruud would discuss potential terminations of employees with the corporate office.  Thus, while Ruud did not have sole or final authority to conduct employee terminations, the evidence suggests that he was "closely involved" with termination decisions and with Yalley's termination decision in particular.  Because there is direct evidence to support a link between Yalley's termination and protected conduct, the Court will deny summary judgment on Yalley's Title VII and MHRA claims.[10]

### III.   MINNESOTA WORKERS' COMPENSATION ACT RETALIATION

The Court must next consider Yalley's Workers' Compensation Act ("WCA") claim.  The WCA provides:

> Any person discharging . . . an employee for seeking workers' compensation benefits . . . is liable in a civil action for damages incurred by the employee including . . . costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefit to which the employee is entitled.

Minn. Stat. § 176.82, subd. 1.  It is undisputed that Yalley filed a workers' compensation claim on or about August 8, 2008, from an injury he sustained on May 16, 2008, attempted to supplement the claim after he allegedly aggravated that injury on or about

---

[9] This decision was abrogated on other grounds by *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  *Torgerson* overruled the holding that a special standard applied in summary judgment motions in discrimination cases.  *Id.* at 1043.

[10] Yalley may also have claims for retaliation based on alleged poor treatment that he received from O'Reilly employees due to his complaints, prior to his termination.

May 28, 2009, attended a hearing on the matter on April 30, 2010, and received the findings and award of the workers' compensation judge on July 19, 2010.  Thus, Yalley sought – and received – workers' compensation benefits and falls under the protections of the WCA.  *See Breitenfeldt v. Long Prairie Packing Co.*, 48 F. Supp. 2d 1170, 1180 (D. Minn. 1999).  Yalley was also discharged on July 23, 2010, less than a week after he received benefits from the workers' compensation judge, thus suffering an adverse action under the WCA.

The question before the Court, as above, is whether Yalley has presented direct evidence of retaliation under the WCA or, in the alternative, has met the McDonnell Douglas test.  *Cf. Young-Losee*, 631 F.3d at 912; *Otto v. City of Victoria*, 834 F. Supp. 2d 912, 916 (D. Minn. 2011).[11]  The Court finds that Yalley has produced direct evidence of retaliation under the WCA.[12]  Ruud allegedly stated, only days after Yalley received workers' compensation benefits, that Yalley was being terminated because he was costing the company too much money and complaining about discriminatory treatment

---

[11] The Court acknowledges that Minnesota courts have stated that WCA retaliation claims are governed by the *McDonnell Douglas* burden-shifting test.  *See, e.g.*, *Graham v. Special Sch. Dist. No. 1*, 472 N.W.2d 114, 119 n.7 (Minn. 1991); *Lundquist v. Rice Memorial Hosp.*, No. A07-0683, 2008 WL 467439, at *2 (Minn. Ct. App 2008).  However, the parties cited to no cases where a court specifically stated that a direct evidence theory could not apply to a retaliation claim under the WCA, and the Court has found none.  It also appears that the Minnesota cases that applied the *McDonnell Douglas* test to WCA claims did not involve direct evidence.  Typically, the *McDonnell Douglas* test is an alternative to proving a case through direct evidence.  *See, e.g.*, *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001).  The Court finds no reason why the direct evidence framework would not also be available to prove a WCA retaliation claim.  Accordingly, the Court will allow Yalley to prove this claim through direct evidence.

[12] Although it was unclear from Yalley's briefing whether he intended to raise a direct evidence argument under the WCA, he clarified at oral argument that he was, in fact, raising such an argument.

because of his disability. The Court finds this statement sufficiently definite to constitute direct evidence of retaliation. *See Bakhtiari*, 507 F.3d at 1137 n.3. Accordingly, the Court will deny O'Reilly's motion for summary judgment.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 24] is **DENIED**.

DATED: January 3, 2013　　　　　　　　　____s/ John R. Tunheim____
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　United States District Judge